## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JOAN O'GRADY, TRUSTEE OF THE JOAN O'GRADY TRUST, derivatively on behalf of PLAINS ALL AMERICAN PIPELINE, L.P., | § § § § § | Civil Action No. 4:16-cv-429 DEMAND FOR JURY TRIAL |
| Plaintiff, | § § § | |
| v. | § § § | |
| PLAINS ALL AMERICAN GP LLC, | § § § | |
| Defendant, | § § § | |
| and | § § | |
| PLAINS ALL AMERICAN PIPELINE, L.P., | § § § | |
| Nominal Defendant. | § § | |

## VERIFIED UNITHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff Joan O'Grady, Trustee of the Joan O'Grady Trust ("Plaintiff"), by and through Plaintiff's undersigned attorneys, hereby submits this Verified Unitholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Plains All American Pipeline, L.P. ("Plains" or the "Company") against Plains All American GP LLC ("Defendant") for breach of contract and breach of the implied contract of good faith and fair dealing from at least February 2013 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.      According to its public filings, Plains is a publicly traded master limited partnership ("MLP") with Defendant serving as its "General Partner," involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Prior to and during the Relevant Period, Plains grew into one of North America's largest energy pipeline operators. That growth was achieved primarily through an acquisition binge during which Plains, under

Defendant's direction and on its watch, acquired significant pipelines and terminal systems – many of them aging and in need of crucial maintenance – in California, Texas and Canada, among other places.  Taking control of a vast network of pipelines placed significant obligations on the Company to ensure the integrity of those networks.

3.      Plains' acquisitions include "Line 901" and "Line 903," which make up the "All American Pipeline," built in 1987 and acquired by Plains in 1998.  Line 901 (a 24-inch diameter pipe) extends approximately 10.6 miles from Exxon's onshore facilities at Las Flores, California on the California coast to Chevron's onshore facilities at Gaviota, California where it connects with Line 903 (a 30-inch diameter pipe) that continues from Gaviota approximately 128 miles through Santa Barbara County, California and into Kern County, California.

4.      As the Company's General Partner, Defendant is expressly in charge of all Company activities and ultimately responsible for its well-being.  As stated on the Company's website, the Company's "operations and activities are managed by [Defendant], which employs [the Company's] management and operational personnel…"  The Company's website likewise states that "the corporate governance of [Defendant] is, in effect the corporate governance of the Partnership, subject in all cases to any specific unitholder rights contained in the partnership agreement."

5.      The parties' legal relationship is expressly governed by the Fourth Amended and Restated Agreement of Limited Partnership of Plains All American Pipeline, L.P. dated May 17, 2012 (the "Partnership Agreement") entered into with Defendant.  Pursuant to the unambiguous terms of the Partnership Agreement, Defendant must only take actions that it reasonably believes "to be in, or not inconsistent with, the best interests of [Plains]."  Any failure by Defendant to do so is a direct breach of the Partnership Agreement.

6.      This Action concerns what happened on the morning of May 19, 2015, when Line 901, owned and operated by Defendant, ruptured and began spilling thousands of barrels of oil into an environmentally-sensitive coastal area in Santa Barbara, California.   Approximately 3,400 barrels – or nearly 143,000 gallons – of crude oil were released.  At least one-fifth of the oil spilled into the Pacific Ocean, destroying beaches, threatening countless species of marine life, and killing hundreds of birds and over 100 mammals, including sea lions and dolphins.

7.      For Defendant, however, ruptured pipelines are nothing new; in fact, since 2006, federal agencies have cited it for over 175 safety and maintenance violations.  What makes this failure different, however, is that this pipeline runs along the edge of the Pacific Ocean, and the rupture sent tens of thousands of gallons of toxic crude oil flowing over some of the most beautiful beaches and pristine waters in California.

8.      This is particularly egregious because Defendant frequently caused the Company to represent that Plains' pipelines were in compliance with applicable regulations, that pipeline integrity and maintenance was Plains' "***primary operational emphasis***" and a "***core value***," and that the Company had undertaken significant measures to prevent oil spills, ensure its pipelines' integrity, and minimize the damage any such incidents may cause.  Defendant even promised that the Company had "implemented" pipeline maintenance and integrity measures that went "***beyond regulatory mandate***."  Further, in an effort to mitigate a history blemished by multiple oil spills, the Company specifically represented that it had adopted significant measures to remedy its past record, including through "pipeline integrity measures" that complied with or exceeded the requirements of a consent order entered into with the U.S. Environmental Protection Agency ("EPA").

9.      Notwithstanding these representations, before Defendant managed to shut off

3

Line 901, it had incredibly spilled over ***100,000 gallons of crude oil***.  Oil coated the shoreline and clung to rocks, sand, wild animals, and marine life.  Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, and forced the closure of beaches, fishing grounds, a variety of shellfish and fishing.

10.    This depressingly familiar story could have been averted had Defendant adequately maintained Line 901, making it less susceptible to corrosion and rupture, installed an automatic shut-off valve on the pipeline, or properly responded to the rupture of Line 901.

11.    Regular maintenance of pipelines is a crucial step that owners of pipelines must take in order to avoid exactly the disaster that occurred with Line 901.  Line 901 was severely corroded prior to the spill, and, in fact had thinned to just 1/16 of an inch in places.

12.    Additionally, under Defendant's direction, three parts of Line 901 adjacent to the rupture were repaired, indicating that they were aware of corrosion, knew how to address it, but simply failed (and were inexplicably unwilling) to do so.

13.    Further, automatic shut-off valves, which Line 901 lacked, are not new or novel; rather, they are ubiquitous on pipelines across the country.  In fact, Line 901 is the only pipeline of its kind in Santa Barbara County without this key safety feature.  The absence of an automatic shut-off system on this pipeline is no accident.

14.    When the pipeline was built in 1987, Santa Barbara County demanded that Defendant install such a shut-off system and allow the County to inspect the welds on the pipeline.  Rather than doing the responsible thing and installing safety systems and protocols, as all the other pipeline owners in the area did, Defendant sued, arguing that the Santa Barbara County lacked the authority to force them to install an automatic shut-off system or inspect their pipeline.  As a result, Line 901 has no automatic shut-off system, and now more than 100,000

gallons of crude oil pollute the waters and beaches on which the people and wildlife of this region depend.  Even now, after the spill, Plains, under Defendant's direction, has publicly announced that it will not install an automatic shutoff valve on Line 901.

15.     The Line 901 disaster and the revelation of Defendant's failure to take corrective actions to protect its pipelines and the environment has caused and will cause severe financial consequences to Plains, including tens of millions of dollars in potential liability for damage to property, commercial interests, and wildlife, as well as possible criminal liability for violations of the Clean Water Act (the "CWA").

16.     For instance, less than a month after the spill, Plains had already incurred more than $60 million in clean-up costs.  As of August 2015, Plains announced that revenue had fallen by 40.5% and, by October 27, 2015, Plains' stock price had dropped by approximately 40% since the close of the markets on the eve of the disaster.

17.     Additionally, the Company's representations regarding its safety measures (caused to be made by Defendant) were false and/or misleading when made.  In reality, the Company, under Defendant's direction and on its watch, systematically eschewed pipeline integrity in an effort to reduce expenses, and Defendant also knowingly or recklessly disregarded multiple red flags indicating both widespread pipeline integrity problems at the Company and severe problems with Plains' pipelines.  As described herein, Plains had inadequate and ineffective pipeline integrity monitoring and maintenance procedures, spill response plans and protocols, and did not comply with federal regulations pertaining to the operation of its pipelines – let alone develop and implement enhanced "integrity measures that go beyond [its] regulatory mandate."

18.     In light of the foregoing, on June 12, 2015, Plaintiff issued a unitholder demand

on the Company's Board of Directors (the "Board") to investigate and take action regarding the Line 901 failures.

19.    On September 15, 2015, Plaintiff's counsel received a letter from Michael C. Holmes ("Holmes") of the law firm Vinson & Elkins LLP ("Vinson Elkins"), which expressly declined to investigate Plaintiff's June 12, 2015 demand letter and which noted a technical deficiency contained therein.

20.    Accordingly, on October 19, 2015, Plaintiff cured the technical deficiency identified in the June 12, 2015 letter and issued another unitholder demand on the Company's Board to investigate and remedy potential breaches of the Partnership Agreement by Defendant (the "Demand") in connection with the Line 901 disaster.   A true and correct copy of the Demand is attached hereto as Exhibit A.

21.    On November 23, 2015, Plaintiff's counsel received another letter from Mr. Holmes of Vinson Elkins, which refused to even commence an investigation of the Demand and the allegations asserted herein (the "Refusal").  A true and correct copy of the Refusal is attached hereto as Exhibit B.

22.    Significantly, even though the Company faces massive exposures in connection with the Line 901 disaster, the Refusal states, in no uncertain terms, "that commencing the requested investigation and civil action would not be in the Partnership's best interests at this time." *See* Exhibit B.

23.    Pursuant to Delaware law, the Board was duty bound ***upon receipt*** to investigate the Demand, and its intentional failure to do so cannot be construed as anything but a wrongful refusal.

24.    Thus, given the Board's flagrant disregard of Delaware law and intentional failure

to even investigate the Demand, Plaintiff has been left with no other recourse than filing this Action, which must be allowed to proceed.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendant's primary participation in the wrongful acts detailed herein, occurred in this district.  Defendant maintains its executive offices in this district, and Defendant has received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

27.     Plaintiff is a current unitholder of Plains and has continuously been since February 2006.  Plaintiff is a citizen of California.

28.     Nominal defendant Plains is a Delaware Limited Partnership with its principal executive offices located at 333 Clay Street, Suite 1600, Houston, TX 77002.   Nominal defendant may be served with process by and through its registered agent, Corporation Service Corporation d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

29.     Defendant is a Delaware corporation with its principal executive offices located at 333 Clay Street, Suite 1600, Houston, TX 77002.  Defendant is the General Partner of Plains.

Defendant may be served with process by and through its registered agent, Corporation Service Corporation d/b/a CSC-Lawyers Incorporating Service Company at 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company and Applicable Regulations

30.    According to its public filings, Plains is a publicly traded MLP, involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  Prior to and during the Relevant Period, Plains grew into one of North America's largest energy pipeline operators.  That growth was achieved primarily through an acquisition binge during which Plains acquired significant pipelines and terminal systems – many of them aging and in need of crucial maintenance – in California, Texas and Canada, among other places.  Taking control of a vast network of pipelines placed significant obligations on the Company to ensure the integrity of those networks.

31.    Among Plains' acquisitions were Lines 901 and 903, which make up the All American Pipeline, built in 1987 and acquired by Plains in 1998.  Line 901 (a 24-inch diameter pipe) extends approximately 10.6 miles from Exxon's onshore facilities at Las Flores, California on the California coast to Chevron's onshore facilities at Gaviota, California where it connects with Line 903 (a 30-inch diameter pipe) that continues from Gaviota approximately 128 miles through Santa Barbara County, California and into Kern County, California.  When the line was acquired, Defendant caused the Company to state in its Form 10-K for 1998:

> The Partnership performs scheduled maintenance on the pipeline and makes repairs and replacements when necessary or appropriate. As one of the most recently constructed major crude oil pipeline systems in the United States, the All American Pipeline requires a relatively low level of maintenance capital expenditures. The Partnership attempts to control corrosion of the pipeline through the use of corrosion inhibiting chemicals injected into the crude stream,

external pipe coatings and an anode bed based cathodic protection system. The Partnership monitors the structural integrity of the Plains All American Pipeline through a program of periodic internal inspections using electronic "smart pig" instruments. The Partnership conducts a weekly aerial surveillance of the entire pipeline and right-of-way to monitor activities or encroachments on rights-of-way. Maintenance facilities containing equipment for pipe repair, digging and light equipment maintenance are strategically located along the pipeline. The Partnership believes that the All American Pipeline has been constructed and is maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards prescribed by the American Petroleum Institute and accepted industry standards of practice.

32.     During the Relevant Period, the majority of Plains' pipelines, including Lines 901 and 903, were subject to the jurisdiction of the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration (the "PHMSA"), which enforces regulations promulgated under the Hazardous Liquids Pipeline Safety Act of 1979 ("Pipeline Safety Act" or the "HLPSA").   Under the HLPSA, Plains was required to adopt measures to reduce the environmental impact of oil spills.   In particular, the HLPSA imposes safety requirements on petroleum pipeline operators, like Defendant, related to the "design, installation, testing, construction, operation, replacement and management of pipeline and tank facilities."   Further, federal regulations enacted pursuant to the HLPSA required Defendant "to adopt measures designed to reduce the environmental impact of oil discharges from onshore oil pipelines, including the maintenance of comprehensive spill response plans and the performance of extensive spill response training for pipeline personnel."

33.     Amendments to the HLPSA in 2002 and 2006 required Defendant "to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas unusually sensitive to environmental damage, and commercially navigable waterways."   Accordingly, PHMSA regulations pursuant to the HLPSA required

Plains to implement enhanced measures regarding so-called "high consequence areas" or "HCAs," such as to: (i) conduct assessments of internal and external corrosion; (ii) establish an integrity management program that provides for "[a] continual process of assessment and evaluation to maintain a pipeline's integrity"; (iii) implement "preventive and mitigative measures to protect the high consequence area," including monitoring cathodic protection to control corrosion, establish shorter inspection intervals, and modify systems monitoring pressure and leaks; (iv) "take prompt action to address all anomalous conditions" discovered through an integrity assessment; and (v) consider installation of Emergency Flow Restricting Devices to protect an HCA in the event of a hazardous liquid pipeline release.  Because Lines 901 and 903 were in an HCA – due to their proximity to the pristine and environmentally sensitive Santa Barbara coastline, rivers, state parks, and national forest – they were at all relevant times subject to PHMSA's enhanced HCA requirements.

34.     Plains was also subject to the Federal Water Pollution Control Act, as amended, also known as the CWA, which imposes restrictions and strict controls regarding the discharge of pollutants, such as crude oil, into navigable waters of the United States and Canada, as well as state waters.  Under the CWA, federal and state regulatory agencies can impose administrative, civil and/or criminal penalties for non-compliance with discharge permits or other requirements of the CWA.  Moreover, the Oil Pollution Act ("OPA") amended certain provisions of the CWA related to petroleum product spills into navigable waters.  The OPA makes owners of pipeline facilities subject to strict, joint and potentially unlimited liability for containment and removal costs, natural resource damages, and certain other consequences of an oil spill.  OPA, 49 C.F.R. Part 195 regulates oil spill response plans for onshore pipelines, such as Lines 901 and 903. Such response plans require "[i]mmediate notification procedures" and "[s]pill detection and

mitigation procedures."

35.     Plains was further subject to the EPA's Risk Management Plan regulations. Under EPA regulations, Plains was required to develop and implement a plan to help emergency response personnel prepare for and respond to chemical emergencies.  The plan includes "a five-year accident history, an offsite consequence analysis process, a prevention program and an emergency response program."

### B.     Defendant's Duties Pursuant to the Partnership Agreement

36.     As the Company's General Partner, Defendant is expressly in charge of all Company activities and ultimately responsible for its well-being.  As stated on the Company's website, the Company's "operations and activities are managed by [Defendant], which employs [the Company's] management and operational personnel…"  The Company's website likewise states that "the corporate governance of [Defendant] is, in effect the corporate governance of the Partnership, subject in all cases to any specific unitholder rights contained in the partnership agreement."

37.     According to the Partnership Agreement entered into with Defendant, Defendant must only take actions that it reasonably believes "to be in, or not inconsistent with, the best interests of [Plains]."  Any failure by Defendant to do so is a direct breach of the Partnership Agreement.

38.     As alleged herein, Defendant breached its contractual duties pursuant to the Partnership Agreement and breached the implied contractual covenants of good faith and fair dealing in connection with the Line 901 disaster.

### C.     Defendant Has a History of Irresponsible Operations Resulting in Environmental Disasters, Which Ultimately Forced Plains to Enter into a Consent Decree with the EPA

39.     Over the past decade, Plains and its affiliated companies, under Defendant's direction and on its watch, have reported to federal regulators 229 safety and maintenance incidents on its pipelines.  In fact, only four of the more than 1,700 pipeline operators included in a database maintained by the PHMSA reported more incidents than Plains.  The Company's reported infractions involved pump failure, equipment malfunction, operator error, and pipeline corrosion, resulting in tens of millions of dollars in property damage and the release of more than 688,000 gallons of hazardous liquid.  Plains has also been required to pay millions of dollars in fines and tens of millions of dollars to upgrade more than 10,000 miles of pipe.

40.     According to the EPA, between June 2004 and September 2007, approximately 6,510 barrels (more than a quarter of a million gallons) of crude oil were discharged from various pipelines owned and operated by Plains into navigable waters and/or adjoining shorelines in the states of Texas, Louisiana, Oklahoma, and Kansas in violation of the Clean Water Act.  In particular, the EPA noted the following discharges:

a.      In June 2004, a damaged poly-pipeline slip insert and external corrosion caused nearly 6,000 gallons of crude oil to spill into the East Spring Creek and adjacent wetlands in Kansas;

b.      In November 2004, external corrosion led to the spill of over 1,500 gallons of crude oil into the Latan Creek in Texas;

c.      In December 2004, only months after the size of the Company was nearly doubled by the purchase of another large pipeline operator, a cracked weld joint on a Plains pipeline in Texas caused a discharge of more than 140,000 gallons of oil, sending several thousand gallons into the Pecos River;

d.      In January 2005, a failed pressure relief pin coupled with an undersized temporary relief tank located outside of secondary containment led to the spill of over 37,000 gallons of crude oil, sending discharges into the Sabine River in Texas;

e.      In March 2005, external corrosion on a Plains pipeline in Texas brought about a discharge of oil into Caddo Lake;

f.      In April 2005, internal corrosion of a Louisiana section of Plains pipeline caused nearly 200 gallons of crude oil to spill into Big Lake and adjacent wetlands;

g.      In July 2005, internal corrosion led to a spill of over 1,500 gallons of crude oil into tributaries of Pond Creek;

i.      In November 2005, external pipeline corrosion caused a spill of more than 600 gallons of crude oil in Texas, leading to discharges into Bull Creek Canal;

j.      In August 2007, external pipeline corrosion caused a spill of nearly 13,000 gallons of oil, discharging crude oil into Texas' Colorado River; and

k.      In September 2007, external corrosion of a Plains pipeline in Texas, in a repeat of the August 2007 incident, caused another 3,150 gallons of crude oil to leak from the pipeline, discharging more crude oil into the Colorado River.

41.      In 2010, as a result of these spills, the EPA filed a complaint against Plains, concurrently with the entry of a consent decree (the "2010 Consent Decree"), alleging that the Company was liable for civil penalties and injunctive relief to the United States pursuant to the CWA.   Under the 2010 Consent Decree, Plains was required to pay $3.25 million in civil penalties and spend $41 million to upgrade more than 10,000 miles of pipe.   Additionally, the EPA required Plains to conduct weekly aerial patrols of certain of its pipelines to check for leaks, install computational pipeline monitoring capabilities to ensure ongoing monitoring for 110 segments of pipeline (including Line 901), and spend millions of dollars on efforts to mitigate threats posed by corrosion.

42.      The 2010 Consent Decree additionally imposed various reporting requirements on the Company including, among other things, updates on the status of required compliance measures, summaries of action plans developed pursuant to the 2010 Consent Decree, descriptions of steps taken to implement the action plans, and descriptions of problems

13

encountered or anticipated to be encountered in the implementation of the 2010 Consent Decree, along with implemented or proposed solutions.  The 2010 Consent Decree further provided that Plains would be liable for monetary penalties to the United States for violations of the 2010 Consent Decree.

43.     Notwithstanding the 2010 Consent Decree, on April 29, 2011, a 30-year-old weld on a pipeline in Canada failed, resulting in the discharge of approximately one million gallons of crude oil into marshlands near the community of Little Buffalo, Alberta (the "Little Buffalo Spill").  A persistent odor from the oil forced a nearby school to close for several days.  The pipeline, which had been laid in 1966, was purchased by Plains in 2008.  Investigators found that, before the Little Buffalo Spill, the Company's leak detection gauges produced readings 20 times the level that would indicate a problem, but, according to court records, the Company had few written policies regarding to leak detection, so the problems were not properly reported and the pipeline was not shut down.

44.     Additionally, in June 2012, heavy rains caused a 46-year-old pipeline to leak and spill thousands of barrels of crude oil into the Red Deer River in Alberta, Canada (the "Red Deer River Spill").  The Red Deer River Spill forced a recreational reservoir downstream from the spill to close for weeks, and many residents were treated at a local hospital for respiratory complaints.  The Alberta Energy Regulator, which oversees the oil industry in the province of Alberta, found that Plains had failed to complete inspections of the pipeline at the frequency required by its own maintenance standards, and that the Company did not inspect the pipeline annually, as required by the federal pipeline rules.  Moreover, Plains (under Defendant's direction and on its watch) neglected to take precautionary measures to prevent flood damage, despite warnings from provincial authorities.

14

45.     Further, in May 2014, a valve malfunction caused another Plains pipe to rupture in the Atwater Village neighborhood of Los Angeles, California, causing oil to erupt more than 20 feet into the air and rain down on a nearby strip club and other local businesses.  Patrons of the strip club were coated in oil and the club was forced to evacuate.  According to a report from the California State Fire Marshal, the Atwater Village Spill took several days to clean up and caused more than $3 million in damage to nearby businesses and roads.    Investigators determined that a set of screws holding a valve in place failed, leading to the release of nearly 14,000 gallons of crude oil into the environment.

**D.     Defendant Causes the Company to Falsely State that Plains Has Implemented Enhanced Safety and Maintenance Initiatives**

46.     In the wake of Plains' numerous prior violations and the 2010 Consent Decree, Defendant made a concerted effort to assure investors that Plains had adopted enhanced measures to ensure the integrity of its pipelines, and that, as a result, spill incidents – and the risk of future incidents – had reduced significantly.  For example, in the Company's Form 10-K filed with the SEC on February 27, 2013 (the "2012 10-K"), Defendant pointed to the measures the Company had taken as part of the 2010 Consent Decree, and offered reassurance that "pipeline integrity management" was its "***primary operational emphasis***," and that the Company had "***implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention***."  Defendant further caused the Company to state that its "pipelines are in ***substantial compliance*** with [applicable regulations]" and that the Company's "integrity management program" included measures that went well beyond those legal requirements, with "several internal programs designed to prevent incidents and . . . activities such as automating valves and replacing river crossings."

15

47.    During the Relevant Period, Plains' (and Defendant's) Chief Executive Officer ("CEO") Greg L. Armstrong ("Armstrong") led the effort to convince the public that Plains' maintenance and corrosion control problems were in the past, that Plains went above and beyond applicable regulations when it came to safety and maintenance, that the risk of a catastrophic spill was extremely low, and that the Company was well prepared should a spill occur.  For example, Armstrong dedicated large portions of a June 5, 2014 Investor Day conference to convincing investors that at Plains "**safety is a core value**" and that Plains "**foster[s] a culture that emphasizes operational excellence, asset integrity & safety**."  In his presentation, the top three items Armstrong highlighted as demonstrating Plains' "Commitment to Operational Excellence" were "**Safety**," "**Pipeline Integrity Management**," and "**Incident Response Preparation**."  Armstrong assured the public that "[w]e are committed to operational excellence in safety, pipeline integrity management, and responding to incidents in the unfortunate development that they do occur."  Armstrong was emphatic: "we do a lot and I mean a tremendous amount that will never be appreciated by the public" when it comes to safety and spill prevention.

48.    Defendant also admitted that the Company's (*i.e.,* Defendant's) executive officers were directly involved in and responsible for the Company's safety, pipeline integrity management and incident response preparation.  For example, Defendant caused the Company to state on its website during the Relevant Period that the Company's Environmental, Health and Safety program "is successful because it is **developed, supported and carried out by our employees, from the senior management team down to the newest hire**."  The Company's website also represented that "Plains All American is committed to public safety, protection of the environment and operation of our facilities in a prudent and safe manner" and that Defendant

"believe[s] that all of [the Company's] pipelines have been constructed and maintained in all material respects in accordance with applicable federal, state and local laws and regulations, standards proscribed by the API and accepted industry practice."

49.     Defendant further caused the Company to state that it had "devote[d] substantial resources to comply with [government]-mandated pipeline integrity rules," including "requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas'" – such as the Santa Barbara coastline abutting Line 901 and the state parks, national forest and rivers traversing Line 903 – "where a pipeline leak or rupture could produce significant adverse consequences."  According to Defendant, the Company had "developed and implemented certain pipeline integrity measures that go beyond [its] regulatory mandate."

50.     In fact, the enhanced safety protocols Defendant purportedly instituted in Santa Barbara were illusory – nothing more than false promises used by Defendant to cover up the fact that Plains, under its direction and on its watch, had severely disregarded its pipeline integrity and maintenance obligations and that it was continuing to operate pipelines, like Lines 901 and 903, that should have been taken out of operation.  Indeed, as discussed herein, PHMSA warned Plains after conducting inspections in August, September, and October 2013 that it had committed "probable violations" of the pipeline safety regulations governing "pipeline integrity in high consequence areas" through which Lines 901 and 903 ran.  Among other things, PHMSA found that Plains failed to take additional preventative and mitigative measures in HCAs without any evidence of its justification for its failure to implement the required measures.

51.     Defendant also falsely represented that Plains was well positioned to minimize the impact of spills, assuring investors that in the event any leak was detected, Plains' response

would be "immediate," well-coordinated with public officials, and comprehensive so as to minimize any environmental impact.  In reality, Plains' response plans were either slipshod or nonexistent, and, with respect to Lines 901 and 903, violated PHMSA regulations.

**E.    Defendant Cuts Corners and Flouts Its Responsibilities During the Construction of Line 901**

52.     In 1987, Line 901 was constructed under Defendant's direction and on its watch. At that time, Santa Barbara County's Energy Division (the "Division") sought to ensure that the pipeline was constructed properly by, among other things, inspecting the welds on the pipeline using x-rays.  The Division routinely inspected welds on new pipelines as a way to ensure they had been done correctly to reduce the risk of failure.  The Division also ordered the Company to install an automatic shut-off valve system on the pipeline to ensure that the pipeline would shut down swiftly (and without having to wait for human action) at the first sign of a problem with the pipeline.

53.     Rather than agreeing to these commonplace and common-sense safety protocols, Defendant instead caused the Company to sue Santa Barbara County in federal court, arguing that Santa Barbara County lacked jurisdiction to regulate the Company's pipeline design and installation.  Thus, Line 901 is currently the only pipeline in Santa Barbara County "whereby the county is preempted from monitoring and safety inspections," said Kevin Drude ("Drude"), Director of the County's Energy Division.  Drude has publicly stated that the Company's employees rarely, if ever, attend monthly meetings that he holds to discuss safety concerns with all the pipeline operators under his jurisdiction.[1]

54.     Also, as a result of the Company's lawsuit against Santa Barbara County (commenced and litigated under Defendant's direction), today the Company (under the

---

[1]    *See*:    http://m.independent.com/news/2015/may/21/whos-watching-man-whos-watching-pipeline/.

Defendant's direction and on its watch) operates the only pipeline of its type in Santa Barbara County without an automatic shut-off valve system.  For those reasons, it is the only pipeline that is capable of failing and discharging more than 100,000 of gallons of oil.

### F. On Defendant's Watch, Line 901 Ruptures and a Catastrophic Oil Spill Ensues

55.    Line 901 runs along the edge of the Pacific Ocean, transporting up to 6,300,000 gallons of oil per day between Gaviota and Las Flores, California.  The route takes the pipeline along many private properties and past several state parks and beaches, including Refugio State Beach, carrying crude from offshore platforms inland, and from there to refineries.

56.    On the morning of May 19, 2015, Line 901 ruptured.  Before Defendant actually caused the Company to shut off Line 901, the pipeline had discharged over 100,000 gallons of crude oil.  Oil coated the shoreline, clinging to rocks, sand, and the animals it touched.  Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, and forcing the closure of beaches, fishing grounds, and shellfish operations.

57.    Contrary to Defendant's public representations, Plains was wholly unprepared for the spill once it began.  For example, state law required the Company to report the spill to the federal National Response Center within 30 minutes of detection – and the Company's own plans indicated that it should take no more than 15 minutes to discover a release and shut down the flow and required such notification "at the earliest practicable moment."  Yet, Plains did not report the spill to the National Response Center for hours after it had been discovered.  In fact, it was not Plains, but a 911 call placed to the local fire department, that alerted the National Response Center to the spill.  Although Plains officials noticed anomalies in Line 901 by 10:30 a.m. and shut down the pipeline at 11:30 a.m., government officials first learned of the spill

through a 911 call from beachgoers to the Santa Barbara County Fire Department at approximately 11:42 a.m.  And it was the local fire department that first notified the National Response Center of the spill at 12:43 p.m. – nearly two-and-a-half hours before Plains notified the agency.

58.     Defendant worked hard to conceal the scope of the problem.  As a result, in the wake of the spill, "[v]arious county officials . . . expressed multiple concerns with [their] experience with [the] unified command throughout the current situation it is felt that the information was controlled, not transparent and definitely not responsive."  At a public hearing on June 26, 2015, those officials expressed "ongoing concerns about the role of the responsible party, in this case Plains, and the dynamics that allowed that party to influence virtually every aspect of response and communication often contrary to the local agencies' values and practices."

59.     One day after the spill, on May 20, 2015, the *Associated Press* (the "*AP*") published an article entitled "Latest on California oil spill: Governor declares emergency."  The article stated, in relevant part:

> ***Gov. Jerry Brown has declared a state of emergency in Santa Barbara County over the coastal oil spill.***
>
> The move Wednesday night from the governor frees up emergency state funding and resources to help in the cleanup efforts.
>
> ***Also Wednesday, Santa Barbara County District Attorney Joyce Dudley says her office, along with the state attorney general, is investigating the pipeline spill for possible criminal prosecution or a finding of civil liability.***
>
> The chairman and CEO of the company, Plains Pipeline LP, says he deeply regrets that the incident happened and apologized to residents and visitors affected by it.

The spill occurred Tuesday about 20 miles west of Santa Barbara. A broken onshore pipeline spewed oil down a storm drain and into the Pacific Ocean for several hours before it was shut off.

2:45 p.m. (PDT)

The company that owns a pipeline that spewed oil into California coastal waters says that under the worst-case scenario, up to 105,000 gallons of crude leaked in the spill.

How much of that ended up in the ocean remains unclear.

The Plains All American Pipeline company says in a statement the current estimate remains 21,000 gallons, but it says that figure is under investigation.

The spill happened Tuesday about 20 miles west of Santa Barbara. The broken onshore pipeline spewed oil down a storm drain and into the Pacific Ocean for several hours before it was shut off. *The spill created two slicks that span about 9 miles.*

1 p.m. (PDT)

An oil industry group says it will review a California oil spill once cleanup is complete to learn from it and try to prevent future spills.

"As an industry, we are always concerned when accidents like this happen," the Western States Petroleum Association said in a statement Wednesday.

The spill happened Tuesday about 20 miles west of Santa Barbara. A broken onshore pipeline spewed oil down a storm drain and into the Pacific Ocean for several hours before it was shut off.

*The spill created two slicks in coastal waters that span 9 miles.*

The pipeline is owned by Plains All American. It carries crude oil produced by companies operating on the Central Coast and delivers it through a maze of pipes to refineries around the state.

11:30 a.m. (PDT)

The company that owns the pipeline that broke and spewed oil into the Pacific Ocean says it's still unknown exactly how much oil was lost, but the pipeline was operating at maximum capacity.

Plains All American Pipeline LP official Darren Palmer says the pipeline was running at a rate of 2,000 barrels an hour — equivalent to 84,000 gallons.

Initial estimates put the spill about 20 miles west of Santa Barbara at approximately 21,000 gallons. But U.S. Coast Guard Capt. Jennifer Williams has said that figure was likely to change after a flyover provides a better sense of its scope.

She said Wednesday the oil slicks now stretch about 9 miles.

The 24-inch pipeline spewed oil down a storm drain and into the ocean for several hours Tuesday before it was shut off.

On Wednesday, crews fanned out along Refugio State Beach to work on cleanup. [Emphasis added.]

60.     By the end of May 2015, several United States Senators were publicly calling into question the Company's (and, in turn, Defendant's) response to the spill.  On May 29, 2015, the *AP* published an article entitled "Response by operator of broken oil pipeline faces scrutiny." This article revealed, in relevant part:

U.S. Sens. Barbara Boxer and Dianne Feinstein of California labeled the response to the spill "insufficient" in a letter Thursday to the Pipeline and Hazardous Materials Safety Administration. ***The senators questioned why the line lacked an automatic shut-off valve and whether some workers were left on the sidelines while the leak spread.***

"We need answers about why this happened, why the response was insufficient and what can be done to prevent another tragic spill like this from happening in the future," said the letter, which also was signed by Massachusetts Sen. Edward J. Markey, a fellow Democrat.

***"We are concerned that insufficient preparation may have slowed down the response effort,"*** they wrote.

In reply, Plains All American Pipeline said it was a "competent and experienced operator."

"We train regularly for situations such as this, hoping that they will never happen. However, in a real event, no one is fully satisfied with the speed of response," the company said in a statement late Thursday. "Upon confirming the release, we immediately activated our emergency response plan and marshaled critical resources to the scene, scaling up those resources quickly as we better understood the cleanup requirements."

*Among the senators' concerns: It took Plains about 90 minutes after the spill to notify the National Response Center, a clearinghouse for reports of hazardous-material releases that coordinates responses, according to disclosures so far. Additionally, Plains had reported problems with the line earlier that day.*

*"We are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment," the senators wrote.*

Linda Krop, chief counsel of the Environmental Defense Center, said she was at the shore until 10 p.m. the day of the spill and nothing was being done to prevent crude from washing into the sea.

*"The response was extremely tardy that allowed oil to get in the water where it will never be fully recovered,"* Krop said. "Waves were washing oil off the beach and off the rocks and nothing was being done." [Emphasis added.]

61.     A June 4, 2015 *AP* article entitled "Pipeline that spilled oil on California coast badly corroded" revealed, in relevant part:

*"There is pipe that can survive 80 percent wall loss," said Richard Kuprewicz, president of Accufacts Inc., which investigates pipeline incidents. "When you're over 80 percent, there isn't room for error at that level."*

The morning of the spill, operators in the company's Houston control center detected mechanical issues and shut down pumps on the line. The pumps were restarted about 20 minutes later and then failed, prompting another shutdown of the line.

Restarting the pumps could have led to a rupture, or a break in the line could have caused the pumps to fail, but Kuprewicz cautioned it's still too soon to determine what caused the failure.

In either case, a hole that size would have leaked at a high rate — even with the pumps off — and may not have been quickly detected by remote operators. [Emphasis added.]

62.     Initially, the oil covered the beach and rocks just below the failed pipe.  But once it reached the water, the oil quickly spread, travelling for miles out to sea.  The oil fouled beaches for miles in each direction, spreading along the shoreline, and washed up on nearby properties.  As of June 8, 2015, the spill had impacted up to 50 miles of shoreline along the

Central Coast.

63.     On June 10, 2015, the *AP* reported that cleanup costs had already reached $62 million.   Additionally, cleanup costs were running at $3 million per day, and there was no timetable for when the cleanup would be complete.

64.     By June 22, 2015, Defendant confirmed that the oil had washed up in identifiable tarballs on Manhattan Beach, 130 miles south of Santa Barbara.   Subsequently, tarballs matching Plains oil washed up on Orange County beaches.   It is presently unknown how far north the oil spill has traveled.

**G.      Defendant Causes the Company to Issue False and Misleading Disclosures Regarding the True Extent of the Spill**

65.     In the days immediately following the rupture of Line 901, Defendant attempted to downplay and conceal the severity of the oil spill.   Plains officials reported that their own analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that as many as 105,000 gallons in total could have been released from Line 901, with only 21,100 gallons of crude oil – at most – flowing into the Pacific Ocean.

66.     Subsequently, on May 26, 2015, Defendant caused the Company to file a Form 8-K with the SEC, which described the spill and estimated that "the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons – a figure reflecting a 4,000-gallon reduction from the initial estimates that Plains had provided to the media.

67.     Finally, on August 5, 2015, Defendant caused the Company to disclose in an investor presentation given in connection with 2Q15 results that the spill could actually be 1,000 barrels – 143,000 gallons – 42% larger than previously reported.   Defendant further disclosed that both the U.S. Department of Justice and the California Attorney General were investigating

the spill, and that the Company could be liable for potential criminal violations of the CWA. Further, Defendant disclosed that Lines 901 and 903 were subject to multiple PHMSA corrective actions. Defendant also disclosed for the first time that the spill would cost Plains $257 million, and that the Company's insurance did not cover all of the costs associated with the spill. Defendant further made clear that the $257 million cost did **not** include any lost revenue associated with the shutdown of Lines 901 and 903.

68.     Significantly, this was not the first time that Plains, under Defendant's direction and on its watch, had engaged in this type of deception. Despite applicable regulations requiring Plains to provide reasonable estimates of spill volumes when a spill may result in property damage exceeding $50,000 or the pollution of any body of water, Plains has demonstrated a pattern and practice of understating spill volumes, only to later revise them upward. For example:

- On April 29, 2011, the Rainbow Pipeline, a 45-year old Plains pipeline ruptured in Alberta, Canada, resulting in the worst oil spill in that area in 36 years. On the day of the spill, Plains reported to the Canadian authorities that the pipeline released an estimated 260,400 gallons. The actual spill size was 1,176,000 gallons – four and half times larger than the reported spill.

- On December 24, 2006, Plains' High Island Pipeline ruptured and spilled crude oil into the Gulf of Mexico. On the day of the spill, Plains provided an estimated release of 20,000 gallons. The actual spill size was 36,540 gallons – more than 80 percent larger than the reported spill.

- Plains' Pocahontas Station spilled crude oil into Silver Creek, a high consequence area near a drinking water reservoir in Illinois. According to a PHMSA Corrective Action Order dated July 14, 2015, on the day of the spill, Plains provided an estimated release of "0 barrels" and an "unknown value" for spillage into the creek. The actual spill size was later corrected to 4,200 gallons.

69.     The misrepresentation of the Line 901's spill amount was a continuation of Plains' pattern of regulatory violations and rampant misstatements to investors. On August 5,

2015, Defendant caused the Company to disclose that the actual spill size was 42,000 gallons higher because:

> In the second half of June we completed the process of emptying and purging Line 901, which resulted in removal of approximately 26,000 barrels of crude oil from the line. This activity provided additional data to assess the reasonableness of our worst case estimate of 2,400 barrels based on the "drain-down" methodology.

70.     This statement is fraught with inconsistencies as Defendant sought to conceal its long-held knowledge of spill underestimation from the public.  Indeed, the "purge" was completed long before the "second half of June."  As discussed below, in May 2015, PHMSA ordered Plains to empty and purge the 10.6 miles of affected pipeline (Line 901) and fill it with inert gas as soon as applicable "but no longer than **10 days** after the receipt of this order."  On the website Defendant created to track the spill response, www.plainsline901response.com, Plains stated that "[o]n May 28, [2015], under the oversight of PHMSA and the Unified Command, excavation and removal of the affected section of pipe was completed."  It has been alleged that documents obtained from government sources confirm that, in fact, Defendant had excavated, purged, and removed the failed pipe for "mechanical and metallurgical testing and failure analysis" as required by PHMSA, by this date.

71.     Armstrong himself asserted to members of the Congress on June 19, 2015 that "the affected pipe was excavated, placed in a box, sealed and transported to a third-party laboratory for evaluation and testing."  Indeed, Defendant emptied and purged Line 901 by May 28, 2015, not the second half of June as disclosed on August 5, 2015.  In sum, for at least **two months** (if not much longer), Defendant concealed the knowledge of its underestimation of worst case spill.

72.     During those three months, Defendant caused Plains to communicate frequently

about the Santa Barbara oil spill via multiple channels:

- On June 4, 2015, Defendant caused the Company to host an investor day where Armstrong discussed the Santa Barbara oil incident, presented on the Company's history of incidents and release volumes, and encouraged investors to visit the Company website to obtain "daily updates" on the spill;

- On June 10, 2015, as reflected in Plains' June 11, 2015 8-K, filed with the SEC, Plains representatives spoke at a media briefing and answered reporters' questions on the Line 901 crude oil release;

- On the www.plainsline901response.com website, where the Company provided "daily updates," Defendant posted (1) incident updates on June 29, 2015, July 6, 2015, and July 13, 2015; (2) "Recovery Q&As" on June 17, 2015 discussing Plains' safety record, recovery completion, the affected pipeline, and how oil traveled to the ocean; and (3) the investor day presentation from June 4, 2015 and Armstrong's letters to members of Congress from June 24, 2015; and

- Plains representatives engaged in numerous conversations with the press about the spill between May 28, 2015 and August 5, 2015.

73.     At all times beginning no later than May 28, 2015, in discussing the spill and its effects, the Company, under Defendant's direction and on its watch, was obligated to disclose that the true size of the Santa Barbara oil spill was significantly larger than represented and/or correct its prior misstatements regarding the size of the spill.

74.     Additionally, as required by PHMSA guidelines for pipelines located in HCAs, the spill response plan for Lines 901 and 903 contains a summary of a "Risk and Hazard Analysis" performed by Plains to evaluate the likelihoods and consequences of a major breach in Lines 901 and 903. The spill response plan determined that the maximum discharge from a spill, or the "Worst Case Discharge," was 167,000 gallons (3,400 barrels) – 1,000 barrels more than originally reported and much closer to the amount of oil spilled during and following the Line 901 rupture that was ultimately disclosed on August 5, 2015.

75.     Further, for the worst case spill volume, the risk analysis assumes "10 minutes

total time to detect rupture and 5 minutes to shutdown pipeline." On the day of the spill, Plains' computer monitoring system in its control room in Midland, Texas failed to detect the rupture for hours. It was not until 1:30 p.m. – more than *two hours* after the rupture – that Plains employees sought to staunch the gushing oil using a single shovel to construct "a makeshift berm."

### H.      The PHMSA Issues a Formal Notice of Probable Violation and Compliance Order Against Plains

76.      On May 21, 2015, PHMSA issued a Corrective Action Order (the "May 21 CAO") requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards caused by the spill. The May 21 CAO noted certain preliminary findings concerning the spill, including that Line 901 had been inspected by Plains on May 5, 2015 as part of a complete in-line inspection to collect data and evaluate the integrity of the pipeline. The May 21 CAO noted that Plains had not yet received a formal report regarding that inspection, but that previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity. In 2007, there were 13 anomalies identified that related to corrosion of Line 901, and in 2012, an inspection identified 41 such anomalies. Further, PHMSA found that Plains used shrink wrap sleeve coating on Line 901. The May 21 CAO required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan, performing a review of the Company's emergency response plan and training, and identifying all areas of Line 901 that used shrink wrap sleeve coating.

77.      On June 3, 2015, PHMSA issued an amended Corrective Action Order (the "June 3 CAO") that revealed that there was "*extensive external corrosion*" on Line 901 and also identified "*extensive corrosion*" and other deficiencies on adjoining Line 903. The June 3 CAO required Plains to take additional corrective actions, including shutting down Line 903. PHMSA

28

noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.

78.     Specifically, the June 3 CAO stated:

The results of Plains' May 5, 2015 In-Line Inspection (ILI) survey revealed four areas on [Line 901] with pipe anomalies requiring *immediate investigation and remediation* in accordance with 49 C.F.R. §195.452(h) or Plains' own criteria for investigation under its integrity management plan. Examination and measurements of three of these areas indicated *extensive external corrosion*, primarily on the bottom quadrant of the pipe. The deepest *metal loss* at each area, as measured by Plains nondestructive testing contractors, ranged between *54% and 74%* of the original pipe wall thickness. The anomalies were not limited to being near the girth welds, but also occurred at other locations along the length of the pipe. The fourth area to be investigated has not yet been completed.

[Line 901] is experiencing *active external corrosion*, as follows:

- Plains has reported to PHMSA that the May 5th ILI survey revealed metal loss of approximately 45% of the original wall thickness in the area of the pipe that failed on May 19.

- PHMSA inspectors noted *general external corrosion* of the pipe body during field examination of the failed pipe segment.

- The rupture characteristics at the Failure site indicate a longitudinally oriented opening approximately 6 inches in length and located in the bottom quadrant of the pipe. Third-party metallurgists in the field estimated that corrosion at the Failure site had degraded the wall thickness to an estimated 1/16 of an inch (.0625"). This thinning of the pipe wall is greater than the 45% metal loss which was indicated by the recent ILI survey.

- PHMSA inspectors observed three repairs to [Line 901] in the area near the Failure site that had been made due to external corrosion. These repairs were made after the 2012 ILI survey.

79.     The pipeline wall's corrosion to one-sixteenth of an inch amounts to a reduction of over *80%* of the original thickness.  PHMSA further noted that inspection surveys conducted for different segments of Line 903 appeared inconsistent – a red flag that should have prompted immediate investigation by Defendant – and ordered the Company to shut down Line 903 as

well.

80.     On September 11, 2015, PHMSA sent Plains a Notice of Probable Violation and Proposed Compliance Order ("September 11 Compliance Order") to Troy Valenzuela, Plains' Vice President of Environmental Health and Safety at Plains' headquarters in Houston.   The September 11 Compliance Order was based on violations found during PHMSA's August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013 inspections of Lines 901 and 903 conducted pursuant to Chapter 601 of 49 United States Code.   The September 11 Compliance Order outlined several "probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations."

81.     The September 11 Compliance Order determined that Plains violated §195.310(a) because "Plains did not maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven (7) breakout tanks at Pentland Station in Kern County, California." During the inspections, Plains was unable to "present evidence of past pressure tests performed on the breakout tanks to the inspection team."   Although Plains later provided PHMSA with records of tests from 1995, those "documents did not demonstrate that pressure tests were performed on the tanks in accordance with" applicable law.

82.     PHMSA also found two probable violations of §195.452, governing "Pipeline integrity management in high consequence areas."

83.     First, Plains could provide no written evidence during or after the inspection that it had undertaken the required preventive and mitigative evaluations prior to or during 2013 for segments of Line 903 that run through HCAs.  Specifically, the September 11 Compliance Order states:

> Plains did not maintain adequate documentation of its preventive and mitigative evaluations prior to the 2013 calendar year for "Sisquoc to Pentland" and

"Pentland to Emidio" pipeline segments. A Plains representative eventually stated in an email, dated March 25, 2014, that the company was unable to locate the 2013 preventive and mitigative evaluations for those pipeline segments.

84.      Second, the September 11 Compliance Order found that Plains failed to take

additional preventative and mitigative measures in HCAs, and was unable to show evidence that

it had even considered such measures or provide a justification for the failure to implement them

in violation of applicable law.  Specifically, the September 11 Compliance Order states:

> For High Consequence Areas (HCAs) where Plains does not take additional preventive and mitigative (P&M) measures, Plains did not adequately document its consideration of P&M measures or its justification for not implementing these measures. The inspection team found a lack of documentation to demonstrate the consideration and decision-making process of potential P&M measures.

85.      The September 11 Compliance Order further found that Plains violated §195.403,

which governs Emergency Response Training, because Plains could produce no documentation

to demonstrate the required annual review of response training or the "the decision-making

process for changes made to its program."   Additionally, Plains "did not have adequate

documentation to demonstrate that supervisors maintained a thorough knowledge of that portion

of the emergency response procedures established under §195.402 for which they are responsible

to ensure compliance."

86.      Finally, the September 11 Compliance Order found that Plains violated §195.507

regarding recordkeeping because "Plains did not document which qualified contractors

performed each covered task on a daily basis.  Each project file had a written list of all qualified

individuals, but there was no written documentation to show who performed each task on a day-

to-day basis."

87.      Plains was aware of the probable violations identified by PHMSA in the

September 11 Compliance Order at the time of the 2013 inspections, or shortly thereafter.

Although the final September 11 Compliance Order was sent on September 11, 2015, the foregoing "findings and probable violations were determined *prior to* the May 19, 2015 crude oil spill in Santa Barbara County, California."  Further, "PHMSA requested additional information [from Plains] following [PHMSA's] field visit, which was provided between late 2013 and June 2014."  Finally, the September 11 Compliance Order states that the items detailed therein "were discovered in these 2013 inspections, and include consideration of supporting documentation provided by Plains in 2014."

88.     In addition to the probable violations, PHMSA enumerated a series of "Additional Areas of Safety Concern" in the Compliance Order.  PHMSA stated that "[d]uring the course of our inspection, our representatives found concerns that may impact your current level of safety.  These areas of concern were discussed with Plains during the inspection, but they are not considered to be explicit regulatory violations.  Nevertheless, PHMSA recommends that these issues be addressed to improve the level of safety on your pipeline system."

89.     First, "Plains had unclear procedures and documentation of its decision making process for addressing when in-line inspection (ILI) tool run data indicates anomalous conditions.  Specifically, the Plains procedures did not appear to fully discuss or document how tool tolerance was addressed or how measured anomalies that deviated significantly from the size predicted by the tool were addressed."

90.     Second, "Plains had incomplete documentation of its Management of Change (MOC) for a pressure reduction.  The inspection team found an incomplete MOC form, specifically Plains MOC form 5012-5004, dated January 12, 2012.  A pressure reduction was to be taken, but the current and proposed pressure set points were inadequately documented."

91.     Finally, "Plains is responsible for educating emergency response officials as part

32

of its Public Awareness Program.  A review of Plains' Emergency Response Contact Reports for local fire and sheriff departments on June 26, 2013 indicated evidence of a lack of familiarity with the California One-Call System. Plains did not provide any documentation of follow-up where Plains educated emergency response officials on the One-Call System."

92.    On November 12, 2015, PHMSA sent Valenzuela Amendment No. 2 to the May 21 CAO ("November 12 CAO"), which contained additional findings and required Plains to take additional corrective actions with respect to Lines 901 and 903.  The additional findings arising from PHMSA's investigation of the accident included the following:

- PHMSA's independent review of in-line inspection (ILI) tool surveys for Lines 901 and 903 over the past 10 years found that anomalies were "***under-called***" in areas of general corrosion.  Direct field examination and measurements of the anomalies revealed that the actual length and width of the anomalies were greater than the measurements predicted by the ILI tool.  Specifically, on Line 901, direct measurement of the metal loss anomaly at the failure site and other anomalies excavated in 2015 showed that these anomalies were generally more significant than the ILI results indicated they would be.

- Common practice in the pipeline industry is to provide the ILI vendor with field data from direct investigation of anomalies to validate the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements.  After excavating, investigating, characterizing, and measuring anomalies from the results of various ILI surveys, ***Plains did not share its actual field findings with the ILI vendor so that it could enhance its interpretation of the ILI data***.

- PHMSA's independent review of ILI surveys from the past 10 years show that Line 903, particularly the Gaviota to Sisquoc segment, has ***similar corrosion characteristics as Line 901 and a number of the anomalies had characteristics consistent with the failure site***. Specifically, Line 903 has both localized and larger or "general" areas of external corrosion.

*        *        *

- Freeport-McMoRan Oil & Gas (Freeport) operates a 37-mile pipeline system from its Hidalgo, Hermosa and Harvest offshore platforms. . . . This unprocessed crude may contain water, natural gas, and other

33

impurities that contribute to internal corrosion.  According to Freeport, the biocide and rust inhibitor in this crude oil will begin to lose effectiveness around November 2015, adding to the risk of accelerated internal corrosion on Line 903.

- Due to the number of corrosion-caused anomalies identified on Line 903 in past ILI surveys, particularly on the Gaviota to Sisquoc segment, *it does not appear that Plains has an effective corrosion control program and the pipe can be expected to have degraded (lost metal due to corrosion) since the last ILI survey*.  Furthermore, leaving crude oil in Line 903 is likely to result in an increased potential for internal corrosion as the inhibitor loses its effectiveness.  The crude oil in Line 903 needs to be removed from the pipeline and the line purged with an inert gas in order to prevent further degradation of the pipeline, and eliminate the potential harm it poses from an unintended release.

- Stress corrosion cracking (SCC) or environmentally-assisted cracking can be induced on a pipeline from the combined influence of tensile stress and a corrosive medium.  As noted in PHMSA's Advisory Bulletin ADB-03-05 (issued October 7, 2003), SCC is commonly associated with disbonded coatings.  Disbonded coatings may prevent the cathodic protection current used for corrosion control from reaching the pipe surface and allow an SCC-susceptible environment to form between the pipe and coating.  Tape coatings and shrink wrap sleeves are both coatings susceptible to disbondment and may lead to corrosion and possibly environmentally assisted cracking or SCC. Line 903 has shrink wrap sleeves on the girth welds, which could contribute to SCC.

93.      In light of these findings, and PHMSA's conclusion that "a failure to issue this Order expeditiously to require immediate corrective action would result in the likelihood of serious harm to life, property, or the environment," Plains was required to immediately take steps to empty, purge, and shut down Line 903.  Plains was also required to provide a purge plan that included the "[i]dentification and remediation of any anomalies with characteristics similar to the Line 901 failure location."   Plains was also ordered to provide its in-line inspection ("ILI") vendor "with the field measured data and request that the ILI vendor use the field data to re-evaluate the ILI results in order to identify any additional anomalies that must be remediated per §195.452(h) or that have characteristics similar to the Line 901 failure location."  Finally, Plains

was ordered to provide additional training and "enhanced preventive and mitigative measures that Plains will implement to monitor the pipeline during the purge activity."

94.     PHMSA's findings were based on historical data Defendant either knew about or recklessly disregarded.  For example, PHMSA's conclusions that "it does not appear that Plains has an effective corrosion control program" and that Line 903 likely had degraded further since the last ILI were based on their study of historical ILI data that had been provided by Plains' ILI vendor, The ROSEN Group ("Rosen"), to Plains in real time.  PHMSA's conclusion that Plains' ILI surveys "under-called" anomalies was based on the same data.

**I.     Defendant Knew of or Recklessly Disregarded Severe Corrosion Problems on Lines 901 and 903, Which Led to Line 901's Spill and Line 903's Shut Down**

95.     Following initiation of operations of Line 901, Plains conducted periodic inspections of the condition of the pipeline with internal inspection devices called pipeline inspection gauges, or "smart pigs."  Smart pigs are run inside a pipeline to detect anomalies caused by corrosion, cracks, laminations, dents and other defects.  These runs are referred to as ILIs.  ILIs were conducted on Line 901 between the Las Flores and Gaviota pump stations starting in September 1996.  Additional ILIs were performed in June 1 and 19, 2007, July 2012, and May 5, 2015.  Beginning with the 2007 ILI, Rosen conducted the ILIs on Lines 901 and 903.

96.     According to PHMSA, "[i]n 2007 and 2012, there were 13 and 41 excavations of ILI-identified anomalies on the pipeline, respectively.  These anomalies were mostly due to external corrosion, frequently located near the pipeline's girth welds."  Such a dramatic increase in the number of identified anomalies during the 5-year period indicates that corrosion processes acting on the pipeline were very active despite Plains' purported external and internal corrosion mitigation processes.

97.     It has been alleged that documents obtained from a governmental sources confirm

that following the 2007 ILI, Plains obtained permits to address *15 anomalies* on Lines 901 and 903, 13 of which were present on Line 901. Furthermore, documents related to Plains' application for permits to address these anomalies discovered in the 2007 ILI reveal that one of the anomaly digs – Anomaly Dig Site 6 – "[a]ppears to be the *location of the current spill incident*" that occurred on May 19, 2015. And, PHMSA revealed in the June 3 CAO that three repairs had been made on Line 901 "in the area near the Failure site that had been made due to external corrosion," many of which can be seen in photographs of the excavated Line 901 segment.

98.    In addition, governmental records indicate that following the 2012 ILI, Plains obtained permits to address *82 anomalies* on Line 903, the same anomalies that led to the eventual shutdown of Line 903. Thus, Defendant had previously identified the anomalies at the precise location of Line 901's rupture and those riddled along Line 903 that resulted in its eventual shut-down. Rather than replace the pipe, as required given the age of the pipe and the proliferating corrosion, Plains opted to conduct patchwork repairs.

99.    On May 5, 2015, Rosen conducted an ILI that revealed four areas on Line 901 with pipe anomalies that required "*immediate investigation and remediation*" under relevant regulations and Plains' own integrity management plan. Rosen's normal practice was to immediately notify Plains of any anomalies, such as those found in the May 5 ILI, which required immediate attention. Such anomalies were identified by Rosen in a preliminary "first pass" of the data and communicated to Plains within seven to 14 days, meaning Plains would have received notice of the anomalies requiring immediate corrections before the spill or, at the very latest, on the day of the spill. Under applicable regulations, the Company was required to shut down Line 901 pending resolution of the immediate issues. Had Defendant complied with

applicable regulations, the eventual Line 901 spill would have been avoided entirely.

100.    It has been alleged that partial, redacted, results from the 2007 ILI survey of Line 901 identified 29 features in Line 901 that had corrosion metal loss that equaled or exceeded 40% of the pipeline wall thickness and 12 features that had corrosion metal loss that equaled or exceeded 50% of the pipeline wall thickness.  These metal losses were attributed both to external corrosion (frequently located near the pipeline girth welds) and internal corrosion.  The 2007 ILI survey results identified the top five most severely corroded locations.  These locations had maximum depths of corrosion that ranged between 52% and 67% of the pipeline wall thickness. These results indicate that Line 901 was experiencing very active internal and external corrosion despite of Plain's purported maintenance and corrosion control procedures.

101.    As PHMSA found in November 12 CAO, Plains violated common industry practice by failing to provide its ILI vendor, Rosen, field data necessary to properly calibrate ILIs of Lines 901 and 903.  Thus, these ILI survey report results do not include corrections to account for the ILI instrument's "under-call" of the feature depths determined from the instrument readings, a fact PHMSA also found in the November 12 CAO.  Available data on the type of ILI instrumentation used to perform the 2007 survey indicates that the bias (true depth/instrument depth) would be in the range of 1.2 to 1.25 for a range of metal losses of 40% to 50%, meaning that ILIs underestimate metal loss by 20% to 25%.

102.    Moreover, Line 901 was set in sandy granular soils characteristic of coastal beach deposits.  These soils, the coastal environment, the tendency for the pipeline to accumulate water inside and outside, and the associated surface drainage features could be expected to produce a highly corrosive environment for a buried steel pipeline.

103.    PHMSA also found that Lines 901 and 903 were susceptible to corrosion because

of the shrink wrap sleeve repairs made at some of the pipeline's girth welds.  Shrink-sleeve coating is a process whereby plastic coatings are wrapped around the joints of a pipeline's welded areas.  These plastic coatings are prone to disbonding from the pipe, allowing moisture to enter, and leading to corrosion and environmentally assisted cracking or stressed corrosion cracking.

104.    These facts, known to Defendant during the Relevant Period, demonstrate that extensive severe external and internal corrosion was allowed to develop and persist in Line 901. This severe external and internal corrosion was developed in Line 901 before 2007 and it existed in an unmitigated condition in sections of the pipeline as late as May 2015, when Line 901 eventually burst.

105.    After the May 19, 2015 oil spill, Plains also had to suspend the nearby Line 903's operation as its ILI results from the past 10 years revealed similar localized and general corrosion characteristics to Line 901 and many of the anomalies were consistent with those at Line 901's rupture site.  Plains informed PHMSA that Line 903 also used shrink wrap sleeves on the girth welds.  During an inspection of the 38-miles segment between the Gaviota and Sisquoc Stations on April 26, 2013, the vendor reported 99 metal loss anomalies.  Similarly, during the June 12, 2013 inspection, the 75-mile segment between Sisquoc and Pentland Stations had a vast number of metal loss anomalies consistent with general corrosion.  For the 15-mile segment between Pentland and Emidio Stations, two girth weld anomalies required further investigation.

106.    Despite these extensive issues with Line 903 and the recent disaster at Line 901, Plains continued to operate Line 903 until PHMSA ordered Plains to shutdown Line 903. PHMSA's shutdown order also directed Plains to purge Line 903.  Accordingly, on November 12, 2015, PHMSA demanded that Plains act to halt further degradation of Line 903 by purging

the line with inert gas in order to prevent another incident of unintended release of crude oil.

**J.    Defendant Operated Line 901 at an Unlawful Pressure in Light of Known Corrosion on the Line**

107.    Line 901's normal maximum operating pressure ("MOP") is reported to be 650 pounds per square inch gauge ("psi").  Plains has reported that immediately prior to the failure, the line pressure was approximately 700 psi.  According to Plains, this increase in the pipeline pressure was associated with the unplanned shut-down of the pump at the Sisquoc pump station and the delayed shut-down of the pump at the Las Flores pump station.

108.    After the pipeline was constructed, the pipeline was pressure tested in October 1990.  Based on results from the pipeline pressure test and application of the PHMSA guideline for Transportation of Hazardous Liquids by Pipeline, 49 C.F.R. §195, the pipeline was determined to have a Maximum Allowable Operating Pressure ("MAOP") of 1025 psi.

109.    According to PHMSA, Line 901 is comprised of 24-inch diameter, 0.344 inch wall thickness, X-65 steel grade, high frequency electric resistance welded ("ERW") girth welded pipe sections.

110.    As provided in PHMSA regulations, application of a validated computational analytical model to predict the burst pressure of a pipeline with 58% corrosion results in a burst pressure of 700 psi, equal to the reported Line 901 unplanned pressure of 700 psi prior to the rupture.  This level of corrosion correlates with the PHMSA report metal loss on Line 901 of "approximately 45% of the original wall thickness in the area of the pipe that failed on May 19." Correcting this level of corrosion for the ILI's "under-call" of the measured depth, a wall thickness loss of 56% results.  Based on ILIs in 2007 and 2012, Plains was well aware that Lines 901 and 903 were operating with corrosion that measured as high as 67% even before correcting for the "under-call" bias.  Defendant also knew that this corrosion was getting worse as time

went by but continued to operate the lines at excessive pressure.

111.   As prescribed by PHMSA regulations, remaining strength calculations for corroded pipelines were performed using the PHMSA-prescribed computational analytical models (*e.g.*, ASME/ANSI B31G) that have been validated with pipeline burst pressure testing results (tests performed in the laboratory and in the field on in-service pipelines).  The computed "limiting pressure" was based on the MAOP of 1,025 psi.  The validated analytical models indicated a "limiting corroded wall thickness loss" of approximately 50% for Line 901.  PHMSA regulations for assessment of corroded pipelines indicate that if the pipeline has corrosion features that are equal to or greater than 50%, that the features be properly repaired, the pipeline section replaced, or the MAOP lowered.

112.   According to Plains, the May 2015 ILI survey showed 45% corrosion at the failure location, even before correcting for the "under-call" bias and notwithstanding PHMSA's finding that the wall at the rupture site had corroded to 1/16 of an inch (80% corrosion).  When correcting for the ILI "under call," the 45% corrosion level exceeds the computed limiting corroded wall thickness which, again, required Plains to immediately repair the Line or reduce the Line's pressure.  Moreover, three other anomalies near the rupture site had wall thickness losses in the range of 54% to 74%, which similarly exceed the computed limiting corroded wall thickness.

113.   The 2007 ILI corrosion results indicate that since 2007, significant parts of Line 901 would not have satisfied PHMSA's Integrity Management – Corrosion Control guidelines without either properly repairing the corrosion damage, replacing the affected sections of the pipeline, or reducing the MAOP.

114.   Additionally, the 2007 ILI survey report also contained a summary of information

40

on the properties of Line 901.  The 24-inch diameter pipeline was identified as being comprised of DSAW X65 *and* X60 steels.  Locations of the sections of pipeline fabricated with X60 steels were not identified.  If present in Line 901, these lower strength steel sections would have even lower burst strengths.

### K.    Defendant Knew Line 901 Had Reached or Exceeded its Useful Life

115.    As described above, construction on Lines 901 and 903 began in 1987.  The lines went operational in 1990.  When Line 901 ruptured in May 2015, the line was 28 years old and had been operating for 25 years – one of the oldest pipelines owned by the Company.  According to the Company's financial statements filed with the SEC, Lines 901 and 903 had a *maximum* useful life of 30 years.  In order for the Company to properly account for the depreciation of its pipelines, Defendant had to accurately estimate the useful life for each pipeline.  SEC and Generally Accepted Accounting Principles ("GAAP") rules require companies to depreciate assets based on the asset's useful life (ASC 360-10-35-3), and continually evaluate the appropriateness of the useful life of that asset (ASC 360-10-s99-2, SAB Topic 5.CC).  Defendant represented that useful life estimates for Line 901 were based on various factors including its condition, manufacturing specifications, technological advances and historical data concerning useful lives of similar assets.  As detailed herein, Defendant knew that Line 901 was not only near the end of its useful life based on supposed comparable assets, but that the Line was located in a sandy, water-logged coastal environment and rife with serious corrosion problems.

116.    Likewise, Defendant knew that Line 903 was exposed to material that caused similar corrosive effects.  In addition, in calculating the useful lives of Lines 901 and 903, Plains failed to consider that the pipelines were in HCAs.  In fact, Plains used the same 30-year useful life to cover the entire All American Pipeline, without regard to whether they traversed an HCA.

If, in fact, Defendant monitored and evaluated the condition of Lines 901 and 903, as publicly represented during the Relevant Period, then Defendant knew, but simply ignored, that the Lines were at or past the end of their useful lives.  Otherwise, Defendant failed to monitor and evaluate Line 901, in contrast to its Relevant Period representations.

> **L.**    **Decreasing Volumes Motivated Defendant to Look the Other Way as Lines 901 and 903 Deteriorated**

117.    The Company's All American Pipeline system, which included Lines 901 and 903, transported crude oil from two outer continental shelf ("OCS") fields, off the shore of California.  On February 27, 2013, Defendant caused the Company to report in its 2012 Form 10-K that "[v]olumes shipped from the OCS are in decline."  In its 2013 Form 10-K filed on February 28, 2014, and repeated in its 2014 Form 10-K filed on February 25, 2015, Defendant slightly modified the Company's disclosure to say "[v]olumes shipped from the OCS are expected to decline."   From a peak of 152,000 average net barrels per day in 1995, oil transported on the All American Pipeline declined to 37,000 average net barrels per day in 2014, the last reported figure – a ***75% reduction***.  Based on Defendant's own disclosures, volumes had declined significantly and were likely to decline even further.

118.    Declines in oil production from the All American Pipeline system meant Defendant had little incentive to undertake the massive repairs necessary to keep an almost thirty-year-old pipeline safe and compliant with regulations.   As discussed herein, Plains estimated the maximum useful life of a pipeline to be 30 years.  Thus, for an aging pipeline near the end of its maximum useful life of 30 years, transporting less and less oil, Defendant knowingly, or at least severely recklessly, made the calculation that it was not worth the costs required to conduct the necessary repairs.  And these repairs, as the spill ultimately showed, would have required more than patchwork, one-off fixes – they would have required

replacements of large segments of pipeline heavily damaged by years of exposure to a highly corrosive, coastal environment.

119.   Despite the fact that Lines 901 and 903 traversed HCAs, Defendant's motivation to repair pipelines with diminishing volumes and life expectancy was further diminished by the fact that Plains' insurance covered clean-up costs from any spills.  As Armstrong reported in the August 5, 2015 conference call to investors, while the total loss for the Santa Barbara spill was a $257 million charge, this cost was "offset by an estimated $192 million insurance recovery," which covered "actual and projected emergency response and cleanup costs, natural resource damage, third and third party claim settlements, as well as estimate for fines, penalties, and certain legal fees."

120.   And diminishing volumes on Lines 901 and 903 meant that any repair costs or maintenance capital spent on those lines would have detracted from PAA's reported adjusted EBITDA and the distributable cash flow – the two primary performance metrics Defendant looked at in determining the Company's executives' bonuses.  Avoiding replacement costs for Lines 901 and 903 had the desirable effect of increasing profits for the transportation segment, which was critical to Plains' consolidated earnings projections provided to Wall Street during the Relevant Period.

121.   For example, in a May 21, 2015 National Association of Publicly Traded Partnerships Annual Investor Conference in Orlando Florida, the Company stated "Transportation segment is the ***leading driver*** of anticipated 2015 adjusted EBITDA growth (*i.e.*, 24% year-over year growth, or ~$1.2B contribution)."   In fact, Defendant boasted that the Company met or exceeded EBITDA guidance for the past 13 years (53 consecutive quarters). By avoiding the costs associated with replacing Lines 901 and 903, Defendant was able to

continue the Company's "meet or beat" record.  As a result, it was simply not worth it to Defendant to perform the repairs necessary to Lines 901 and 903 that would have prevented the Santa Barbara spill.

### M.  Defendant Knowingly Failed to Conform to Industry Standards When Inspecting and Maintaining Lines 901 and 903

122.    As detailed herein, Plains violated common industry practice of providing ILI vendors with results of field measurements and data after the operator's investigations of anomalies.  As PHMSA stated, this practice enables the validation of "the ILI tool's detection capabilities and limitations, the accuracy with which it can locate and size anomalies, and the confidence associated with the tool's measurements."

123.    During the 2008 and 2009 inspections of Plains' procedures for integrity management and operations and maintenance, PHMSA and the California State Fire Marshal found Plains' data integration process inadequate in addressing ILI tool uncertainty.  Plains' integrity management program did not specify an approach to handling the tool tolerances.  As a result, PHMSA required that Plains' process for validating ILI results be modified to incorporate the known ILI "under-call" bias.

124.    Four years later, during its 2013 inspections of Lines 901 and 903, PHMSA again raised the concern to Plains that its integrity management procedures failed to address how differences in anomalies as directly measured in the fields and as sized by ILI tool would be handled.  As discussed above, between 2008 and 2013, Plains made numerous excavations to investigate Line 901's corrosion anomalies.  However, Defendant failed to share these field measurements and findings with the Company's vendors, in contrast to industry standards.  As a result, the vendors did not have the benefit of actual field findings to use in assessing its ILI tool's anomaly detection capabilities, limitations, and accuracy.

125.    After the spill, PHMSA reviewed ILI results from the past 10 years for Lines 901 and 903 and determined that the ILI tool under-called the anomalies with respect to general corrosion.  Consistent with research available at the time of the inspections, the actual length and width of the anomalies as measured during field examinations were greater than those in the ILI surveys.  Furthermore, the actual metal loss at the rupture site and other excavation areas were more significant than the ILI surveys indicated.

126.    Plains, under Defendant's direction and on its watch, also failed to conform to industry standards because, as discussed above, Plains' pipelines are the only ones in Santa Barbara county operating without automatic shutoff system.   Such a system would have automatically shut off the Las Flores pump upon detecting changes in pressure and flow indicative of a problem in the pipeline.  Instead, Plains relied on a manual system requiring remote shutdown by personnel located in Midland, Texas.  The Midland Control Room's delay in shutting down the Las Flores pump caused pressure surges in the pipeline after the Sisquoc pump broke down twice in the morning of the spill.  The Santa Barbara County planner and the Environmental Defense Center stated that the spill would have been less extensive, if not avoided, had Plains installed automatic shutoff system in its pipelines.

127.    On June 26, 2015, Dianne Black ("Black"), Assistant Director of Planning and Development Department for Santa Barbara County, confirmed that automatic shut-off systems are the safest pipeline shut-off mechanism and that, despite the heightened safety, Plains was the *only* pipeline operator in Santa Barbara County that did not utilize automatic shut-off systems.  For example, Black testified that "environmental impacts are reduced, the potential for environmental impacts are reduced, with pipeline safety systems that include an automatic shut off system."  Thus, when asked, "if [Plains] had an automatic shut-off system, that may have

been an earlier warning," Black confirmed: "I think it would have been an earlier reaction and it certainly could have *reduced the amount of oil spilled*."  Black also testified that she disagreed with Plains' position that automatic shut-off systems may be more dangerous that manual shut-off systems.

      N.      **Defendant Violated Federal Regulations Governing HCAs**

128.     PHMSA's inspections of the Lines 901 and 903 pipeline systems between August to October 2013 revealed that Plains, under Defendant's direction and on its watch, failed to take the required enhanced preventive and mitigative measures required for pipelines in an HCA and failed to document any justifications or considerations for not implementation such measures as required by applicable regulations.  The regulations for pipeline integrity management in HCAs, 49 C.F.R. §195.452, require operators with pipelines in HCA to conduct risk analyses to identify additional measures to prevent and mitigate consequences of a pipeline failure in an effort to enhance environmental and public safety.

129.    As discussed above, Lines 901 and 903 are high-risk pipelines under HLPSA regulations.  Lines 901 and 903 pass through environmentally sensitive areas, such as the pristine Santa Barbara coastline and state parts, natural forests, and rivers.   The pipelines were constructed during 1987 to 1990 and have been in operation for more than 25 years.  Plains own ILIs and PHMSA's investigations showed that the pipelines' age was further exacerbated by extensive general and localized corrosion conditions.  Furthermore, Line 901's 24-inch diameter with average daily volume of over 30,000 barrels per day (or over 1.26 million gallons) made its potential oil release volume sizable in the event of a spill. Plains failed to implement additional preventive and mitigative measures or enhanced practices to protect the area, as required by applicable regulation, and continued to operate the Lines for years after PHMSA's inspections

until Line 901 eventually ruptured.

**O.    Defendant Failed to Correct Known Emergency Response Deficiencies on Lines 901 and 903 Despite PHMSA's Warnings**

130.    Following inspections of Lines 901 and 903 in August, September, and October 2013, PHMSA warned Plains about its deficient response plans, insufficient training, and insufficient record-keeping related to spill response preparedness.  Further, in December 2013, Plains received a warning letter from PHMSA indicating that the Company was in probable violation of several HLPSA regulations related to pipeline management and control room management, including failure to record pipeline MOP information.  In fact, PHMSA's December 24, 2013 warning letter particularly concerned the Control Room Facilities in Midland, Texas, which, on the day of Line 901's rupture, failed to detect the spill for hours. PHMSA's December 2013 letter informed the Company of the findings from two inspections undertaken on March 19-21, 2013 and June 11-12, 2013.  It specifically found violations for failing to: (1) follow Management of Change procedures by not maintaining documentation as required by PHMSA when, for example, new pipelines were added or taken offline; (2) complete Abnormal Operations forms, including providing MOP information; and (3) maintain or provide any records demonstrating an at least annual review of the controller training program to identify potential improvements.  The September 11 Compliance Order following the spill later reiterated Plains' incomplete documentation for its Management of Change for a pressure reduction.

131.    Additionally, in its June 3 CAO, PHMSA found, among other things, that Plains lacked adequate leak monitoring systems, in violation of applicable HLPSA and API regulations, and failed to take appropriate remedial measures in response to the pipeline integrity defects that had been previously identified on Line 901, in violation of HLPSA. Ultimately, Plains' response failures and below-industry-standard safety systems exacerbated the disastrous Santa Barbara oil

spill.

132.    These emergency response shortcomings manifested themselves on the day of the Line 901 rupture.  Despite the representations that Plains' spill response efforts would be immediate and well-coordinated, in truth, the response to the Santa Barbara oil spill proved to be a disaster.  In fact, as discussed herein, it was the Santa Barbara fire department that, after the Las Flores pump had been shut down for an hour, notified Plains employees of released oil on Refugio Beach.  Plains took another hour before it discovered the pipeline failure and did not notify the National Response Center until 2:56 p.m. – almost ***three and a half hours*** after the Las Flores pump shut down.

133.    Plains' initial report of the spill further demonstrated Defendant's inept spill response procedures.  For example, even though oil had been leaking through a 24-inch diameter pipeline pumping oil at maximum capacity of 2,000 barrels per hour for several hours, Plains reported generally that "approximately 500 barrels" of oil was spilled for hours.  In contrast to its Relevant Period representations, Plains was unable to respond to and control an oil spill, as it failed to even properly size the release from its pipeline and only learned of the spill from third parties, in violation of law and its own response plan.

**P.    Plains' Industry-Worst Spill Record Establishes a Widespread Culture of Non-Compliance**

134.    At all times during the Relevant Period, Defendant was well aware of the risks associated with Plains' failure to properly address the corroding pipelines.  In addition to the Company's prior spills described above, prior to and during the Relevant Period, PHMSA repeatedly cited Plains for corrosion control deficiencies.  In fact, Plains' systemic corrosion control failures in violation of the HLPSA resulted in more than 78 oil spills since 2006 directly caused by corrosion.  Plains' corrosion-related incidents represented close to 40 percent of the

Company's overall releases and was the leading cause of its oil spills in the past ten years.

135.   The corrosion control deficiencies related to Lines 901 and 903 were not unique;

Plains' pipeline systems throughout the United States were rife with similar problems:

- In 2010, the U.S. Department of Transportation (the "DOT") issued a final order finding that Plains had violated 49 C.F.R. §195.573 for failed to electrically check external corrosion control rectifiers at the intervals required by regulations, to promptly correct corrosion control deficiencies, and to examine coupons that monitor corrosion inhibitors in its pipeline systems at various facilities.   These deficiencies were discovered during inspections of Plains' facilities in California, Colorado, Wyoming, Utah, Montana, Louisiana, Oklahoma, New Mexico, Mississippi, and Texas.

- In 2011, the DOT issued a final order and held that Plains' violation of 49 C.F.R. §195.581 for failing to coat a pipeline against atmospheric corrosion would be considered a prior offense in subsequent enforcement actions.   This deficiency was found during a New Mexico facility inspection.

- In 2013, the DOT issued a final order finding that Plains had violated 49 C.F.R. §195.579 for inadequacies and inconsistencies in Plains' procedure on corrosion control, an insufficient number of coupons used to monitor the effectiveness of corrosion inhibitors, and again, failure to examine coupons at the required interval at certain facilities.   These deficiencies were found during inspections of Plains' facilities in Oklahoma, Texas, New Mexico, and Louisiana.

- In 2013, PHMSA issued a warning letter to Plains for violation of 49 C.F.R. §195.579 for failing to inspect a portion of pipeline for internal and external corrosion in violation of regulatory requirement to conduct examination of a pipeline whenever it is exposed.   This deficiency was found during inspections of Plains' headquarters in Texas and facilities in Wyoming.

- In 2014, PHMSA issued a warning letter to Plains for violation of 49 C.F.R. §195.581 for the failure to properly coat pipings against corrosion at different locations, resulting in coating degradation at multiple facilities.

136.   In fact, PHMSA data reveals that Plains, prior to and during the Relevant Period,

was the *worst* pipeline operator in the United States as measured both by the number of total

incidents and number of incidents per 1,000 miles of pipeline operated.   Such incidents raised

red flags during the Relevant Period that were known to Defendant, but ignored in favor of a short-sighted profits-based strategy that directly contradicted the Company's public statements.

137.    Despite regulatory agencies' efforts in imposing civil penalties and injunctive relief, Plains' record continued to worsen.  The number of Plains pipeline incidents resulting in significant releases of greater than 20 barrels *increased* by 44% in the four years after the execution of the 2010 Consent Decree when compared to the four years leading up to the 2010 Consent Decree.

138.    Armstrong recognized Plains' dismal record in his internal presentation to Plains employees on environmental safety just hours before the Santa Barbara disaster: "***Have we always highlighted or communicated safety as much as we could/should have? Undoubtedly we have not***.  Can we do even better? You bet! . . . Must we do better? Absolutely."  However, when speaking with investors, Armstrong blamed others for Plains' dismal record: "We used to say: I really fear shallow-line pipelines and deep-pulling plows, because if somebody pulls their plow through our pipeline it may be their fault but it's our problem, and we have to go out and take care of that . . . you have the same goal, zero incidents.  That doesn't always happen.  There are wrecks; people do pull in front of you; things happen."  In truth, nobody pulled a plow through Line 901.

### Q.    As a Result of Defendant's Breaches of the Partnership Agreement, the Company Becomes the Subject of Additional Costly Litigation

139.    As a result of the Defendant's breaches of the Partnership Agreement and the implied contractual covenant of good faith and fair dealing, the Company has not only come under fire from federal regulators, but also it has become the subject of numerous class action lawsuits.

140.    For instance, on June 1, 2015, the Company became the subject of a class action

lawsuit filed in the United States District Court for the Central District of California (the "Business Class Action") brought on behalf of two proposed classes: 1. a Commercial Fishery Class; and 2. a Natural Resources-Based Businesses Class.[2]  The Commercial Fishery Class is defined as all persons who derive a significant portion of their income through the direct harvest of fish, shellfish, or other sea life in the marine waters adjacent to Santa Barbara County.  The Natural Resources-Based Businesses Class is defined as all persons who derive a significant portion of their income from the operation of a business or businesses in Santa Barbara County, where such businesses are dependent upon the coastal and marine natural resources of that county, and that have lost profits as a result of the Line 901 oil spill.

141.    Additionally, on August 20, 2015, the Company also became the subject of a securities class action lawsuit in the United States District Court for the Southern District of Texas (the "Securities Class Action")[3] for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, brought on behalf of investors in the Common Units of both the Company's and the Defendant's stock.  The Securities Class Action likewise alleged claims under §§11, 12, and 15 of the Securities Act of 1933 brought on behalf of persons who purchased units and/or shares pursuant to various offerings of stock and notes made by both the Company and Defendant.

142.    In addition to being named as a defendant in the Business Class Action and the Securities Class Action, it is likely that because of the catastrophic spill, the Company will be

---

[2] *See Stace Cheverez v. Plains All American Pipeline, LP*, No. 2:15-cv-04113 (C.D. Cal. filed Jun. 1, 2015).

[3] The Securities Class Action is captioned: *City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Plains All American Pipeline, L.P., et al.*, Case No. 4:15-cv-2404 (S.D. Tex.).  While the Plaintiff and the Plaintiff's counsel have conducted their own independent investigation, some of the facts contained herein appear in Plaintiffs' Consolidated Amended Complaint filed in the Securities Class Action on January 29, 2016.

named as a defendant in additional lawsuits in the future.  Thus, as a result of Defendant's breaches of the Partnership Agreement and the implied contractual covenant of good faith and fair dealing, the Company has been (and will continue to be) damaged.

>   R.   **The Regulatory Filing Disclosures**

143.   In addition to the false and misleading statements described above, the Company's other statements and certifications in its regulatory filings have been both revealing and misleading.  By way of example only, on February 25, 2015, the Company filed an Annual Report with the United States Securities and Exchange Commission (the "SEC") on Form 10-K (the "2014 10-K").  In the 2014 10-K, the Company stated that it has "experienced (and likely will experience future) releases of hydrocarbon products into the environment from our pipeline...operations" that "may reach surface water bodies."  Accordingly, under no set of circumstances can Defendant claim that it was blamelessly unaware of the possibility of an environmental disaster associated with the Company's pipelines and of the critical importance of operating and maintaining the Company's pipelines in the most responsible manner possible (and in a manner that complied with all federal, state and local laws).

144.   Despite this, under the Defendant's direction and on its watch, the Company has operated and continues to operate pipelines that fail.  This is in direct contravention of the Partnership Agreement, which expressly requires Defendant *only* to take actions that it reasonably believes to be in the "best interests" of the Company.  Defendant knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline, but took no action to prevent such incidents or protect individuals, the environment or the Company.  Indeed, in violation of the Partnership Agreement, the General Partner actively avoided taking action to mitigate the risks and damages that Line 901 pipeline presented.

145.   The 2014 10-K also contained certifications pursuant to the Sarbanes-Oxley Act

of 2002 ("SOX Certifications"), signed by the Company's (and Defendant's) Chairman and

CEO, Armstrong, and the Company's (and Defendant's) Executive Vice President and Chief

Financial Officer, Al Swanson, which certified that the Company's financial statements were

accurate and that the Company's internal controls were effective.   The SOX Certifications set

forth, in relevant part:

> I, [Armstrong/Swanson], certify that:
>
> 1. I have reviewed this annual report on Form 10-K of Plains All American Pipeline, L.P.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f)) for the registrant and have:
>
>> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>>
>> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>>
>> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness

of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*      *      *

I, [Greg L. Armstrong, Chief Executive Officer of Plains All American Pipeline, L.P. (the "Company")/Al Swanson, Chief Financial Officer of Plains All American Pipeline, L.P. (the "Company")], hereby certify that:

(i) the accompanying report on Form 10-K for the period ended December 31, 2014 and filed with the Securities and Exchange Commission on the date hereof (the "Report") by the Company fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

### DERIVATIVE AND DEMAND ALLEGATIONS

146.     Plaintiff brings this action derivatively in the right and for the benefit of Plains to redress the breaches of contract and implied contractual covenants of good faith and fair dealing by Defendant.

147.    Plaintiff will adequately and fairly represent the interests of Plains and its unitholders in enforcing and prosecuting its rights.

148.    In light of the foregoing, on June 12, 2015, Plaintiff issued a unitholder demand on the Board to investigate and take action regarding the Line 901 failures.

149.    On September 15, 2015, Plaintiff's counsel received a letter from Mr. Holmes of the law firm Vinson Elkins, which expressly declined to investigate Plaintiff's June 12, 2015 demand letter and which noted a technical deficiency therein.

150.    Accordingly, on October 19, 2015, Plaintiff cured the technical deficiency identified in the June 12, 2015 letter and issued the Demand on the Company's Board to investigate and remedy potential breaches of the Partnership Agreement by Defendant in connection with the Line 901 disaster.  *See* Exhibit A.

151.    On November 23, 2015, Plaintiff's counsel received the Refusal from Mr. Holmes of Vinson Elkins, which refused to investigate the Demand.  *See* Exhibit B.

152.    Significantly, even though the Company faces massive exposures in connection with the Line 901 disaster, the Refusal states, in no uncertain terms, "that commencing the requested investigation and civil action would not be in the Partnership's best interests at this time."  *See* Exhibit B.

153.    Pursuant to Delaware law, the Board was duty bound ***upon receipt*** to investigate the Demand and its intentional failure to do so cannot be construed as anything but a wrongful refusal.

154.    Thus, given the Board flagrant disregard of Delaware law and intentional failure to even investigate the Demand, Plaintiff has been left with no other recourse than filing this Action, which must be allowed to proceed.

## COUNT I
## AGAINST DEFENDANT FOR BREACH OF CONTRACT

155.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

156.    Pursuant to the express terms of the Partnership Agreement entered into by both the Company and Defendant, Defendant has a contractual obligation only to take actions that it reasonably believes to be in the "best interests" of the Company.

157.    Defendant knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline, but took no action to prevent such incidents or protect individuals, the environment or the Company.   Indeed, in violation of the Partnership Agreement, the Defendant actively avoided taking action to mitigate the risks and damages that Line 901 pipeline presented.

158.    Defendant's actions and/or inactions constitute a breach of its contractual obligation, for which Defendant bears ultimate responsibility.

159.    Plains has performed its obligations and conditions precedent under the Partnership Agreement.

160.    Plains has suffered damages as a result of Defendant's breaches of the Partnership Agreement.

## COUNT II
## AGAINST DEFENDANT FOR BREACH OF THE IMPLIED CONTRACTUAL COVENANT OF GOOD FAITH AND FAIR DEALING

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    Pursuant to the express terms of the Partnership Agreement entered into by both the Company and Defendant, Defendant has a contractual obligation *only* to take actions that it

reasonably believes to be in the "best interests" of the Company.

163.    Defendant knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline, but took no action to prevent such incidents or protect individuals, the environment or the Company.    Indeed, in violation of the Partnership Agreement, the Defendant actively avoided taking action to mitigate the risks and damages that Line 901 pipeline presented.

164.    Plains has performed its obligations and conditions precedent under the Partnership Agreement.

165.    Defendant's actions and/or inactions unfairly interfered with the Company's right to receive the benefits of the Partnership Agreement and constitute breaches of the implied contractual covenant of good faith and fair dealing.

166.    Plains has suffered damages as a result of Defendant's breaches of the implied contractual covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against Defendant and in favor of the Company for the amount of damages sustained by the Company as a result of Defendant's breaches;

B.    Awarding to Plains restitution from Defendant and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendant;

C.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  February 18, 2016                    Respectfully submitted,

*/s/ Meredith Black-Mathews*
Meredith Black-Mathews
Texas Bar No. 24055180
Southern District No. 940923
**POWERS TAYLOR LLP**
Campbell Centre II
8150 North Central Expressway, Suite 1575
Dallas, TX  75206
Tel: (214) 239-8900
Fax: (214) 239-8901
Meredith@powerstaylor.com

**PROFY PROMISLOFF &
CIARLANTO, P.C.**
Joseph M. Profy
Jeffrey J. Ciarlanto
David M. Promisloff
100 N. 22nd Street, Unit 105
Philadelphia, PA 19103
Tel: (215) 259-5156
Fax: (215) 600-2642
profy@prolawpa.com
ciarlanto@prolawpa.com
david@prolawpa.com

**LAW OFFICE OF ALFRED G. YATES,
JR., P.C.**
Alfred G. Yates, Jr.
Gerald L. Rutledge
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033
yateslaw@aol.com

Counsel for Plaintiff

**PLAINS ALL AMERICAN PIPELINE, L.P. VERIFICATION**

I, Joan O'Grady, Trustee of the Joan O'Grady Trust, hereby verify that I am familiar with the allegations in the Complaint, that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 2/10/16

Joan O'Grady
Joan O'Grady